# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

NICOLE CULTRONA,                    )          CASE NO. 5:12-cv-00444
                                    )
                                    )
          PLAINTIFF,                )          JUDGE SARA LIOI
                                    )
vs.                                 )
                                    )          MEMORANDUM OPINION AND
NATIONWIDE LIFE INSURANCE           )          ORDER
COMPANY, et al.                     )
                                    )
                                    )
          DEFENDANTS.               )

This matter is before the Court on cross-motions for judgment on the administrative record filed by plaintiff Nicole Cultrona[1] ("Mrs. Cultrona") (Pl.'s Mot. [ECF No. 25]) and defendants Nationwide Life Insurance Company ("Nationwide Life"),[2] Nationwide Death Benefit Plan (the "Plan"), the Nationwide Benefits Administrative Committee (the "BAC"), and StarLine Group ("StarLine") (Defs.' Mot. [ECF No. 23]). The parties have filed simultaneous opposition briefs (Pl.'s Opp'n [ECF No. 27]; Defs.' Opp'n [ECF No. 28]) and

---

[1] Mrs. Cultrona's motion is styled as an "Amended Motion for Judgment on the Administrative Record, Summary Judgment, and for an Award of Attorney's Fees," while Defendants' motion is styled as a "Motion for Summary Judgment." In this circuit, however, a procedural framework has been put in place for ERISA actions that calls for judgment on the administrative record, not summary judgment procedures. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). The Court reiterated this fact to the parties in its Case Management Conference Scheduling Order of May 21, 2012. (ECF No. 14 at 144.) In effect, though, the parties have briefed the issues in accordance with the *Wilkins* framework.

[2] In her amended complaint, plaintiff refers to defendant Nationwide Life Insurance Company and non-party Nationwide Mutual Insurance Company collectively as "Nationwide." (Am. Compl. [ECF No. 17] ¶¶ 2–3.) Plaintiff then uses the collective reference in raising allegations against Nationwide Life. In their answers, defendants object to the collective reference as improper. (Defs.' Nationwide Life, the Plan, and StarLine's Answer to Pl.'s Am. Compl. [ECF No. 18] ¶ 3; Def. the BAC's Answer to Pl.'s Am. Compl. [ECF No. 26] (collectively, "Answers") ¶ 3.) There are, however, instances in the administrative record where defendants also refer to "Nationwide" without further specification. Where that is the case, the Court will simply refer to "Nationwide" and not assume which specific entity is being referenced.

replies (Pl.'s Reply [ECF No. 29]; Defs.' Reply [ECF No 30]). The matter is ripe for consideration.

## I. BACKGROUND

### A. The Plan and the Policy

Nationwide Life provided an accidental death and dismemberment ("AD&D") benefit under the Plan's Group Accident Insurance Policy No. 0014234-30 (the "Policy"). (First Am. Compl. [ECF No. 17] ¶ 11; Answers ¶ 11; Admin. Rec. [ECF No. 19] at 262.[3]) The BAC is the Plan administrator and named fiduciary. (Admin Rec. at 447–48.) Members of the BAC are appointed by Nationwide Life's Chief Executive Officer. (*Id.* at 447.) As Plan administrator, the BAC is responsible for, among other things, "exercis[ing] discretion and authority to construe and interpret the provisions of the Plan, . . . determin[ing] eligibility to participate in the Plan, and mak[ing] and enforc[ing] rules and regulations under the Plan to the extent deemed advisable . . . ." (*Id.* at 448.) The BAC is also in charge of "decid[ing] all questions as to the rights of Participants under the Plan and such other questions as may arise under the Plan" and "determin[ing] the amount, manner, and time of payment of benefits hereunder[.]" (*Id.*) Defendant StarLine is the claims administrator and managing underwriter for Nationwide Life with respect to the Policy. (*Id.* at 424, 429.)

Under the Policy, a benefit is payable in the event that an insured suffers an "Injury" because of an "Accident." (*Id.* at 269–70.) The Policy defines an "Injury" as "bodily injury caused by the direct result of an *Accident* occurring while a *Covered Person's* coverage is

---

[3] References to specific pages in the case record are made to the continuous page numbering applied to the page header by the Court's electronic docketing system.

in effect under this Policy which results independently of all other causes in a covered loss." (*Id.* at 265.) An "Accident" is defined as "an unintended or unforeseeable event or occurrence which happens suddenly and violently." (*Id.* at 264.) Where an Injury results in loss of life within 365 days of an Accident, the benefit paid is 100% of the insurance amount. (*Id.* at 270.)

Section X of the Plan provides a list of exclusions under which the AD&D benefit will not be paid. Prior to January 1, 2010, Exclusion 12 provided that no benefit was payable for injury or death occurring where "[t]he *Covered Person* being deemed and presumed, under the law of the locale in which the *Injury* is sustained, to be driving or operating a motor vehicle while under the influence of alcohol or intoxicating liquors." (*Id.* at 279.) Effective January 1, 2010, Exclusion 12 was amended to remove the language pertaining to driving or operating a motor vehicle, now excluding payment of a benefit where "[t]he *Covered Person* being deemed and presumed, under the law of the locale in which the *Injury* is sustained, to be under the influence of alcohol or intoxicating liquors." (*Id.* at 291.)

On May 1, 2010, Mrs. Cultrona, an employee of a Nationwide affiliate, became eligible to participate in the Plan and elected to do so. (Am. Compl. and Answers ¶¶ 12–13.) As Mrs. Cultrona's lawful spouse, Shawn Cultrona ("Mr. Cultrona") was a "Covered Person" under the Plan. (Admin. Rec. at 264.) Mrs. Cultrona was the designated beneficiary under Mr. Cultrona's coverage. (First Am. Compl. and Answers ¶ 16.)

## B. The Accident and Its Investigation

On June 5, 2011, a tragic incident occurred at the Cultrona home in Twinsburg, Ohio. At approximately 11:30 a.m. that morning, Mrs. Cultrona entered her home and found Mr. Cultrona lying on the floor of their first-floor bathroom. (Admin. Rec. at 339–40.) Mr. Cultrona

was prone on the floor with his neck and chin resting against the edge of the bathtub and his abdomen resting on the floor. (*Id.* at 340.) Mrs. Cultrona touched Mr. Cultrona, and, feeling that his body was cold, immediately called 911. (*Id.*)

When paramedics arrived on the scene, they noticed a pool of blood on the floor of the garage next to a car. (*Id.*) The paramedics assessed Mr. Cultrona's condition, and he was pronounced dead at the scene. (*Id.*) Later that day, detectives from the Twinsburg Police Department and an investigator from the Summit County Medical Examiner's office arrived and further investigated the home. (*Id.*)

According to the Twinsburg Police investigative report, Mr. Cultrona spent the evening of June 4, 2011 and the early morning of June 5, 2011 drinking with friends. (*Id.* at 384, 388–89.) A cousin of Mr. Cultrona's saw him at a bar in the early morning of June 5, 2011, and described Mr. Cultrona as appearing intoxicated, "stumbling and walking into chairs." (*Id.* at 386.) One of Mr. Cultrona's friends, who had drinks with him in the evening of June 4, 2011, described Mr. Cultrona as an alcoholic. (*Id.* at 389.) Speaking to police officers at the scene, Mrs. Cultrona stated that Mr. Cultrona "may have gotten drunk and fell down, as he has done in the past." (*Id.* at 375.)

On June 6, 2011, the Medical Examiner's office performed an autopsy of Mr. Cultrona, issuing a report, signed by Chief Medical Examiner Lisa Kohler, M.D., determining that Mr. Cultrona died of "[a]sphyxia by extreme and restricted position (positional asphyxia). II: Acute ethanol intoxication." (*Id.* at 342.) The report stated the manner of death as "ACCIDENT: Prolonged and extreme hyperextension of neck and torso while intoxicated." (*Id.*) The report continued, in more detail:

4

> The postmortem toxicology and microscopic liver findings are consistent with an active period of alcohol binge drinking. The autopsy examination did demonstrate Mr. Cultrona to have a scalp laceration consistent with a fall shortly prior to his death; however, the autopsy examination did not demonstrate fatal brain injury, nor is there evidence that the scalp laceration resulted in exsanguination (fatal hemorrhage). Furthermore, the autopsy examination demonstrated no evidence of natural disease which might support a natural mechanism for sudden loss of consciousness. Although the appearance of the scene initially raised some concern for foul play, the autopsy examination ultimately failed to demonstrate findings specifically indicative of a physical altercation. The Manner of Death is ruled accident.

(*Id.* at 330.) A toxicology report showed that Mr. Cultrona's blood serum was tested and found to contain 0.220% ethanol by volume. (*Id.* at 337.)

**C. The Denial of Mrs. Cultrona's Claim**

On June 28, 2011, Mrs. Cultrona submitted an accidental death claim form to defendant StarLine, requesting payment of 100% of the benefit under the Plan, totaling $212,000. (*Id.* at 429–30.) After receiving Mrs. Cultrona's claim form, StarLine enlisted EMSI Investigative Services ("EMSI") to locate the police report, medical examination, autopsy report, and toxicology report for Mr. Cultrona's death. (*Id.* at 423.) EMSI found these documents, along with Mr. Cultrona's driving record, and provided them to StarLine. (*Id.* at 318–404.) StarLine forwarded the documents to Nationwide Life, which concluded, "that we have basis to deny this claim using the alcohol exclusion and/or the fact that the cause of death (positional asphyxia) does not appear to meet the [P]olicy definition of accident or injury." (*Id.* at 313.) Nationwide Life directed StarLine to draft a denial letter and approved the draft. (*Id.* at 308–13.)

On October 21, 2011, StarLine sent Mrs. Cultrona the denial letter, which stated that Nationwide Life, upon review of the Policy, Mr. Cultrona's death certificate, and the reports from the Twinsburg Police Department and the Medical Examiner, was denying payment of the

benefit based on Exclusion 12. (*Id.* at 297–99.) In attempting to quote the exclusion, StarLine mistakenly provided the text from the prior version of Exclusion 12, which contained the reference to "driving or operating a motor vehicle while under the influence of alcohol or intoxicating liquors." (*Id.* at 298.) Mrs. Cultrona's counsel responded to StarLine on November 10, 2011, disputing the finding on the basis that Mr. Cultrona was not driving a motor vehicle when his accident occurred, and therefore Exclusion 12 could not apply. (*Id.* at 295.) On November 17, 2011, StarLine responded to Mrs. Cultrona's counsel, apologizing for the error, explaining that "[t]he Exclusion cited in our denial letter dated October 21, 2011, was quoted incorrectly," and explaining that Exclusion 12 was amended in January 2010. The letter then quoted the amended language, attaching the amendment itself, and stating that "[b]ased on the amended Exclusion 12 language, Nationwide has determined that the denial shall prevail." (*Id.* at 290.)

**D. Mrs. Cultrona's Appeal and the Instant Lawsuit**

On November 18, 2011, Mrs. Cultrona's counsel responded to StarLine's November 17 letter, providing notice of appeal and asking for:

> [C]opies of all documents that you contend prove that Nationwide provided notice of Amendment No. 1 (effective Jan. 1, 2010) to Mrs. Cultrona and all documents comprising the administrative record and/or supporting Nationwide's decision. Ms. Cultrona maintains that she did not receive proper notice of Amendment No. 1 and maintains that Amendment No. 1 is otherwise ineffective to serve as a basis for denying coverage.

(*Id.* at 287.) On November 22, 2011, StarLine responded to Mrs. Cultrona's counsel, confirming receipt of the November 18, 2011 letter, stating that "[a] copy of your letter has been sent to Nationwide and all further correspondence including any information that you specifically requested in your correspondence will come directly from them[,]" and providing Nationwide's

contact details. (*Id.* at 283.) StarLine also forwarded "the complete claim file" to the BAC on December 1, 2011 (*Id.* at 243), and the BAC received the file December 2, 2011 (*Id.* at 242). On December 6, 2011, the BAC wrote to Mrs. Cultrona's counsel and indicated that it would render a decision on her appeal within 60 days. (*Id.* at 241.) The BAC's letter did not mention Mrs. Cultrona's document request, nor were any attachments noted therein. (*Id.*)

On January 19, 2012, the BAC sent Mrs. Cultrona's counsel a letter denying her appeal. (*Id.* at 236.) The letter stated that the denial was based upon review of the Plan, the Policy, Mrs. Cultrona's appeal letter, and StarLine's claim file, including, but not limited to, correspondence between StarLine and Mrs. Cultrona's counsel, the death certificate, the medical examiner's report, the toxicology report, and the police report. (*Id.*) Upholding the denial of Mrs. Cultrona's claim under the amended Exclusion 12, the BAC concluded that Mr. Cultrona "was under the influence of alcohol or intoxicating liquors at the time of the accident . . . ." (*Id.* at 237.)

On February 23, 2012, Mrs. Cultrona brought suit in this Court against the Plan, Nationwide Life, and StarLine. (Compl. [ECF No. 1].) On June 26, 2012, she amended her complaint to add the BAC. (Am. Compl.) In her amended complaint, Mrs. Cultrona asks the Court to overturn defendants' denial of her benefit claim, assess statutory penalties for failure to provide Plan documents upon request, award damages for breach of fiduciary duties, and award attorney's fees.

## II. LAW AND ANALYSIS

### A. Standard of Review for Motions on an Administrative Record

In *Wilkins v. Baptist Healthcare Sys., Inc.*, the Sixth Circuit developed a framework for district courts to employ in adjudicating an ERISA action:

> 1. As to the merits of the action, the district court should conduct a *de novo* review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly. The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.
>
> 2. The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part. This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.
>
> 3. For the reasons set forth above, the summary judgment procedures set forth in Rule 56 [of the Federal Rules of Civil Procedure] are inapposite to ERISA actions and thus should not be utilized in their disposition.

150 F.3d 609, 619 (6th Cir. 1998). *See also Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 430 (6th Cir. 2006) ("The *Wilkins* panel foresaw occasions in which the procedural process of gathering all pertinent information may have broken down at the administrative level and directed the courts to permit discovery in those cases.").

### B. Denial of Mrs. Cultrona's Claim

Mrs. Cultrona believes that the denial of her claim was arbitrary and capricious for five reasons:

> (1) Because the BAC applied Ohio state law instead of local Twinsburg, Ohio law as the "law of the locale" under Exclusion 12;
>
> (2) Because, even under Ohio law, Exclusion 12 could not apply;

8

(3) Because neither the denial letters nor the administrative record reference the specific Ohio statute defendants relied upon in applying Exclusion 12;

(4) Because the BAC failed to consult a proper health care professional when ruling on Mrs. Cultrona's appeal; and

(5) Because defendants "switched their rationale" for denying Mrs. Cultrona's claim, demonstrating a "predisposition to deny" it "regardless of the merits."

### 1. Standard of Review

The decision of an ERISA plan administrator to deny benefits is reviewed *de novo* unless the benefit plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where there is a clear grant of discretionary authority to the plan administrator under the terms of the plan, the court applies an "arbitrary and capricious" standard of review to the administrator's decision to deny benefits. *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011) (citing *Firestone*, 489 U.S. at 115) (internal quotation marks omitted).[4] In this case, the parties agree that the terms of the Plan

---

[4] In *Loan v. Prudential Ins. Co. of America*, 370 F. App'x 592, 594 n.1 (6th Cir. 2010), an unpublished decision from the Sixth Circuit, the court wrote in a footnote that the proper standard of review was "abuse of discretion," citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). Recognizing that prior Sixth Circuit cases applied an "arbitrary and capricious" standard, the court in *Loan* stated that, "in *Glenn*, the Supreme Court made clear that a court reviewing a decision made by a plan administrator with discretionary authority should apply the highly deferential abuse of discretion standard." *Id.* Subsequent published decisions of the Sixth Circuit, however, have continued to apply the "arbitrary and capricious" standard. *See, e.g., Price v. Bd. of Trs. of Ind. Laborer's Pension Fund*, 707 F.3d 647, 651 (6th Cir. 2013); *Farhner*, 645 F.3d at 342; *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010); *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010). Moreover, this Court is not aware of a published Sixth Circuit decision post-*Glenn* that applies an "abuse of discretion" standard. In any event, no aspect of this Court's ruling on the instant motions under an "arbitrary and capricious" standard would be altered by the use of an "abuse of discretion" standard.

clearly grant discretionary authority to the BAC. (Pl.'s Mot. at 590; Defs.' Mot. at 518.) Accordingly, the Court will apply the "arbitrary and capricious" standard of review.

Under the arbitrary and capricious standard, a district court must affirm the decision of the administrator if the record evidence establishes a reasonable basis for the decision. *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693–94 (6th Cir. 1989). The court must determine whether the administrator's decision was "the result of a deliberate, principled reasoning process and . . . supported by substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). A plan administrator's rational interpretation of a plan must be accepted, "even in the face of an equally rational interpretation offered by the participants." *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004). This deference extends to the administrator's interpretation of "ambiguous and general terms" of a plan. *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004).

The arbitrary and capricious standard of review is not, however, a mere "rubber stamp" of the plan administrator's decision. *Id.* at 661. "Deferential review is not no review, and deference need not be abject." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (internal quotation omitted). A district court must "review . . . the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id*. Indications of arbitrary and capricious decisions include a lack of substantial evidence, a mistake of law, bad faith, and a conflict of interest by the decision-maker. *Toohig v. Nat'l City Corp. Amended and Restated Mgmt. Severance Plan*, No. 1:10 CV 657, 2011 WL 2456711, at *3 (N.D. Ohio June 16, 2011) (citing *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)). Similarly, a

decision based upon a selective review of the record or an incomplete record is arbitrary and capricious. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005).

Although the courts must take into account any conflict of interest on behalf of the plan administrator in reviewing a denial of benefits, *Firestone*, 489 U.S. at 115, the Sixth Circuit "has rejected the notion" that a conflict of interest "alters the standard of review." *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 442–43 (6th Cir. 2005) (citing *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998)). However, the Sixth Circuit has also cautioned, "[c]ourts should be particularly vigilant in situations where . . . the plan sponsor bears all or most of the risk of paying claims, and also appoints the body designated as the final arbiter of such claims." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 847 n.4 (6th Cir. 2000). When a claimant "offers more than conclusory allegations of bias[,]" the conflict-of-interest factor is more significant. *Judge v. Metro. Life Ins. Co.*, No. 12-1092, 2013 WL 1188067, at *11 (6th Cir. Mar. 25, 2013) (quoting *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009)).

Mrs. Cultrona argues that the BAC was operating under a conflict of interest when it denied her claim. (Pl.'s Mot. at 587, 589–90.) Indeed, because Nationwide appoints members of the BAC, the instant case presents the sort of situation that the Sixth Circuit urged courts to be wary of in *Emerson*. However, Mrs. Cultrona offers only general observations about the structure of Nationwide and the BAC, not specific circumstances that would indicate the importance of the conflict in this particular instance. The Court, upon its own inquiry, finds no such circumstances. Accordingly, while the Court will consider the conflict in determining

whether the BAC's decision was arbitrary and capricious, it will not afford the conflict significant weight. *See Judge*, No. 12-1092, 2013 WL 1188067, at *11.

**2. The BAC Acted Reasonably in Applying Ohio Law as the "Law of the Locale"**

Mrs. Cultrona asserts that the BAC failed to apply Exclusion 12 reasonably because the "law of the locale" referenced therein must be construed to mean the local law of Twinsburg, Ohio, not Ohio state law. To support this argument, she points to numerous uses of phrases such as "applicable state law" and "laws of the state" elsewhere in the Policy, suggesting that Nationwide made a conscious decision not to reference state law in the text of Exclusion 12. (Pl.'s Opp'n at 642.)

Simply from a logical perspective, Nationwide's references to state law elsewhere in the Plan do not, in this instance, lead to the inference that "law of the locale" must mean the local law of Twinsburg, Ohio. The word "locale" is used in Exclusion 12 to refer to the place where an Injury, as defined in the Policy, is sustained. (Admin. Rec. at 249.) Because nothing in the Plan requires an Injury to occur within the United States to be covered thereunder, a reference to "state law" in Exclusion 12 would not have properly captured instances in which an Injury was suffered outside the country.

Further, other courts have read similar "law of the locale" language to refer to state law rather than local law. *See Hargrave v. Parker Drilling Co.*, No. 10-0141, 2010 WL 3363087, at *6 (W.D. La. Aug. 25, 2010) (applying Louisiana state law to an exclusion in an AD&D plan referencing the "law of the locale in which the Accident occurred"); *Veal v. Nationwide Life Ins. Co.*, No. 5:09-cv-356/RS/MD, 2010 WL 1380170, at *2 (N.D. Fla. March 31, 2010) (applying Florida state law as the "law of the locale" referenced in an identical

12

Exclusion 12 as in the instant case). Moreover, it is, of course, true that Ohio state law applies in Twinsburg, Ohio. Accordingly, the Court finds that Ohio law is properly the "law of the locale in which the *Injury* [was] sustained" under Exclusion 12 of the Plan. Having come to the same conclusion, the BAC acted reasonably.

### 3. The BAC Acted Reasonably in Concluding That Mr. Cultrona Was Under the Influence of Alcohol Under Ohio Law

Ohio does not have a statute defining "under the influence" or "intoxication" in a general sense. Instead, the terms appear in various statutes forbidding specific activities. The most well known example, Ohio's drunken driving statute, forbids, among other things, operating a vehicle with a blood alcohol content at or above 0.08%. Ohio Rev. Code § 4511.19. The statute also, however, forbids simply operating a vehicle "under the influence of alcohol" without defining "under the influence." *Id.* Ohio's prohibition against operating watercraft while under the influence mirrors the drunken driving statute in these respects. Ohio Rev. Code § 1547.11. Ohio's worker's compensation statute explicitly references the drunken driving statute, establishing a rebuttable presumption "that an employee is intoxicated or under the influence" if the employee would be under the influence per the drunken driving statute. Ohio Rev. Code § 4123.54. In less specific fashion, another Ohio statute prohibits the carrying or use of firearms "while under the influence of alcohol" without establishing impermissible blood alcohol levels or defining "under the influence." Ohio Rev. Code § 2923.15 Finally, Ohio's disorderly conduct statute provides, in pertinent part, that "[n]o person, while voluntarily intoxicated, shall . . . [e]ngage in conduct or create a condition that presents a risk of physical

13

harm to the offender or another, or to the property of another." Ohio Rev. Code § 2917.11(B)(2).[5]

Some courts have interpreted state statutory blood alcohol limits established in specific contexts to create a general presumption of intoxication that can operate outside of those contexts. *See Veal*, 2010 WL 1380170, at *2 (applying state drunk driving and firearms statutes to identical Exclusion 12 in the case of a man who died from a fall); *Likens v. Hartford Life and Accident Ins. Co.*, 688 F.3d 197, 200 (5th Cir. 2012) (adopting the definition of "intoxication" in the Texas Penal Code as the proper definition of "legal intoxication" in an alcohol exclusion applied to a man who died from a fall at his home).

The weight of persuasive authority, however, including cases from within this circuit and Ohio state law, counsels that application of state statutes setting blood alcohol limits for specific activities outside of those contexts is improper. *See, e.g.*, *Loan v. Prudential Ins. Co. of America*, 370 F. App'x 592, 596 (6th Cir. 2010) ("Adopting a legal definition [of intoxication] specifically intended to apply to someone who is driving a motor vehicle is not rational as applied to someone who is in his own home and is not operating any machinery."); *Stischok v. Hartford Life Group Ins. Co.*, No. C2-06-1030, 2008 WL 859036, at *7 (S.D. Ohio Mar. 31, 2008) ("The 0.08 blood-alcohol ratio [from O.R.C. § 4511.19] is used to determine only when a person is legally unfit to drive."); *McKeehan v. Am. Family Life Assurance Co. of Columbus*, 805 N.E.2d 183, 185–86 (Ohio Ct. App. 2004) ("Ohio law is […] clear that operating a motor vehicle

---

[5] Citing an Ohio Jury Instruction, defendants argue that "'intoxication' implies more impairment than 'under the influence of alcohol.'" (Defs.' Opp'n at 665.) An Ohio appellate court, however, has stated that "[u]nder common law in Ohio, the term 'intoxication' is a term of art and is often used interchangeably with the phrase 'under the influence,'" *McKeehan v. Am. Family Life Assurance Co. of Columbus*, 805 N.E.2d 183, 185 (Ohio Ct. App. 2004), and the relevant Ohio statutes reinforce that conclusion. To be sure, nothing suggests, and Mrs. Cultrona does not argue, that the phrase "under the influence" represents a more impaired state than the term "intoxication."

with a certain concentration of alcohol in one's blood does not mean that one is 'intoxicated' or 'under the influence' of alcohol in *other* settings."); *State v. Kuhn*, No. 94CA24, 1996 WL 140197, at *4 (Ohio Ct. App. Mar. 25, 1996) (stating that the limits in O.R.C. § 4511.19 "do not (1) create an arbitrary legal definition of intoxication, or (2) apply in any other context beyond the operation of a motor vehicle"); *Thompson v. Life Ins. Co. of N. Am.*, 383 F. App'x 920, 920–21 (11th Cir. 2010) (reliance upon the Florida drunk driving statute outside the context of driving in order to deny benefits based on an intoxication exclusion was arbitrary and capricious).

### i. The Sixth Circuit's Loan *Decision Does Not Control*

Mrs. Cultrona believes that the Sixth Circuit's decision in *Loan* controls and shows that the BAC acted arbitrarily and capriciously in denying her claim. In *Loan*, the court examined Kentucky law in order to define the phrase "being legally intoxicated" in an alcohol exclusion in an ERISA plan. 370 F. App'x at 595. The Supreme Court of Kentucky had already adopted a definition of "intoxication" to be used in alcohol exclusions, applying the standard contained in Kentucky's public intoxication statute. *Healthwise of Ky., Ltd. v. Anglin*, 956 S.W.2d 213, 218 (Ky. 1997). The defendant in *Loan* argued that the court should instead adopt the definition from Kentucky's motor vehicle statute. 370 F. App'x at 595. The Sixth Circuit rejected this argument and adopted the definition selected by the Supreme Court of Kentucky in *Anglin*. *Loan*, 370 F. App'x at 595–96.

The Court finds that *Loan* does not control. To begin with, *Loan* is an unpublished decision, and "[i]t is well-established law in this circuit that unpublished cases are not binding precedent." *Bell v. Johnson*, 308 F.3d 594, 611 (6th Cir. 2002). Further, the court in *Loan* had the benefit of an applicable state supreme court decision, which is not the case here. Moreover, the

court in *Loan* found that it was unreasonable for the plan administrator to apply the definition of "intoxication" from an activity-specific statute (i.e., driving a motor vehicle) to someone who was not performing that activity, but was, instead, in their own home, particularly when the Kentucky Supreme Court had already adopted a definition to be used in applying such exclusions.

Thus, even if *Loan* were mandatory authority, the opinion would stand for, at most, two things: (1) an inferred rule that this Court should apply the definition of "intoxication" adopted by the Ohio Supreme Court, which has not addressed the issue, and (2) that the Court may not import the definition of "intoxication" from a state motor vehicle statute, which defendants explicitly disclaim any reliance upon. (Defs.' Opp'n at 665.)

### ii. It Was Reasonable for the BAC to Rely Upon Ohio Rev. Code § 313.19

Rather than basing its denial upon one or more Ohio statutes setting limits on blood alcohol content with respect to performing specific activities, the BAC claims to have relied on Ohio Rev. Code § 313.19 (Def.s' Mot. at 522), which provides:

> The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death.

The pertinent question, then, is whether it was reasonable for the BAC to believe that, under § 313.19, a coroner's unchallenged finding of intoxication as a cause of death constitutes "deem[ing] and presum[ing], under [Ohio law]," that a decedent was "under the influence of alcohol or intoxicating liquors." The Court finds that it was.

16

The Ohio Supreme Court has held that, under § 313.19, "the coroner's factual determinations concerning the manner, mode and cause of the decedent's death, as expressed in the coroner's report and death certificate, create a non-binding, rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary." *Vargo v. Travelers Ins. Co.*, 516 N.E.2d 226, 229 (Ohio 1987). "[O]ne function of R.C. 313.19 is to set forth the presumptive value of a coroner's determination as evidence in civil and criminal cases in which the cause, manner, and mode of death are at issue." *TASER Int'l, Inc. v. Chief Med. Exam'r of Summit Cnty.*, No. 24233, 2009 WL 826416, at *10 (Ohio Ct. App. Mar. 31, 2009). Accordingly, the coroner's duties under the statute are "quasi-judicial in character," and the death certificate is "admissible as prima facie evidence of the facts therein stated." *Vargo*, 516 N.3.2d at 229 (quoting *Perry v. Indus. Comm'n*, 160 117 N.E.2d 34, 37 (Ohio 1954)). "[T]o rebut the coroner's determination, . . . competent, credible evidence must be presented." *Id.* "The hearing conducted by the court pursuant to [§] 313.19 is a judicial proceeding, and the procedures and results must be in accord with the Rules of Evidence." *Estate of Holley v. Am. Family Life Assurance of Columbus*, No. 04CA5, 2005 WL 1097799, at *3 (Ohio Ct. App. May 5, 2005).

The medical examiner's report states that the cause of Mr. Cultrona's death was "[a]sphyxia by extreme and restricted position (positional asphyxia). II: Acute ethanol intoxication." (Admin. Rec. at 342.) "Acute ethanol intoxication" is listed as "[e]vidence of positional asphyxia," and the examiner states that Mr. Cultrona "died due to apparent positional asphyxia when he became unconscious while intoxicated (passed out)" and that "[t]he postmortem toxicology and microscopic liver findings are consistent with an active period of

17

alcohol binge drinking." (*Id.* at 343.) Similarly, the death certificate lists "Acute Ethanol Intoxication" as a "significant condition contributing to death but not resulting in the underlying cause," and describes Mr. Cultrona's injury as "Prolonged And Extreme Hyperextension Of Neck And Torso While Intoxicated." (*Id.* at 421.)

Mrs. Cultrona has not attempted to rebut these findings, and instead offers the conclusory and unsupported statements that "[a] coroner's determination is not law," and, even if it were, "§ 313.19 does not deem and presume Mr. Cultrona, as a matter of law, to have been 'under the influence of alcohol' in his bathroom." (Pl.'s Opp'n at 643.)

The administrative record shows, however, that the medical examiner found Mr. Cultrona to have been intoxicated by alcohol at the time of his death and that his intoxication contributed thereto. Section 313.19 provides that the examiner's findings, in the event, as here, they go unchallenged, are to be "legally accepted." Under Ohio law, this establishes a non-binding, rebuttable presumption that Mr. Cultrona was intoxicated at the time of his death. *See Vargo*, 516 N.E.2d 229. Given that presumption, it was certainly reasonable for the BAC to believe that Mr. Cultrona had been "deemed and presumed, under [Ohio law], to be under the influence of alcohol or intoxicating liquors" at the time of his death.[6] Accordingly. the BAC's denial of the benefit based on Exclusion 12 was not arbitrary and capricious.

**4. Defendants Substantially Complied with ERISA's Procedural Requirements in Their Communications with Mrs. Cultrona**

Mrs. Cultrona claims that defendants could not have reviewed § 313.19 because their denial letters do not refer specifically to that statutory section and it does not appear in the

---

[6] The Court stresses that its determination is particularized to the specific facts of this case. The Court expresses no opinion on the reasonableness of reliance upon § 313.19 in any other circumstances.

18

administrative record, and therefore defendants acted arbitrarily and capriciously in denying her claim. This argument requires the Court to examine whether the communications between defendants and Mrs. Cultrona meet ERISA's procedural requirements for the handling of benefits claims, including those having to do with denial letters. According to 29 U.S.C. § 1133:

> In accordance with regulations of the Secretary, every employee benefit plan shall—
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

The implementing regulations require that a plan administrator provide a claimant with "written or electronic notification of any adverse benefit determination," which must provide:

> (i) The specific reason or reasons for the adverse determination;
>
> (ii) Reference to the specific plan provisions on which the determination is based;
>
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; [and]
>
> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review[.]

29 C.F.R. § 2560.503–1(g).

When evaluating benefits decisions for procedural errors, the Court "utilizes a 'substantial compliance' standard." *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 808 (6th Cir. 1996). Under that standard, the Court will not disturb a benefits decision based on a

procedural defect when the plan administrators fulfilled the purposes of § 1133: "insuring that the claimant understood the reasons for the denial of the claim as well as her rights to review of the decision." *Id.* at 807. All communications between an administrator and a plan participant are considered in determining whether the information provided was sufficient under the circumstances. *Wenner v. Sun Life Assurance Co. of Canada*, 482 F.3d 878, 882 (6th Cir. 2007). Procedural violations, however, "entail substantive remedies only when some useful purpose would be served." *Kent*, 96 F.3d at 807. Remand is not required if it would represent "a useless formality." *Id.*

Both denial letters substantially comply with the requirements of § 1132. Each lists that defendants reviewed the medical examiner's report, the toxicology report, the death certificate, and the police report, determining therefrom that Mr. Cultrona was intoxicated at the time of his death. (Admin. Rec. at 236–37, 297–98.) Each also refers to the specific Plan provision upon which the determination was based: Exclusion 12, the alcohol exclusion. (*Id.* at 237, 298.)[7] Further, the denial letters informed Mrs. Cultrona of the Plan's review procedures and the applicable time limits, including Mrs. Cultrona's right to bring a civil action under ERISA § 502(a). (*Id.* at 237, 298–99.)

Mrs. Cultrona does not cite to any authority to support her contention that defendants had to specifically reference § 313.19 in their denial letter or that § 313.19 has to be referenced in the administrative record in order for defendants to assert that they relied upon it in determining that Mr. Cultrona was "under the influence of alcohol or other intoxicating liquors."

---

[7] StarLine's October 21, 2011 letter referred to an incorrect version of the exclusion, an error that was corrected in its November 17, 2011 letter. (*Id.* at 290–91.)

Defendants' communications, taken as a whole, fulfilled the purposes of § 1133; that is, they insured that Mrs. Cultrona understood the reasons for the denial and her rights to appeal the decision. *See Kent*, 96 F.3d at 807 (finding substantial compliance with § 1133 even though "the first [denial] letter did not meet the requirements of the statute and regulation, and the second letter was untimely"). Moreover, even if defendants' communications with Mrs. Cultrona did not substantially comply with § 1133's requirements, remand would be a "useless formality" because defendants' denial of her claim was reasonable.

### 5. The BAC Was Not Required to Consult a Medical Expert in Making Its Determination

Mrs. Cultrona also argues that the BAC acted arbitrarily and capriciously by failing to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment," as she alleges is required under 29 C.F.R. § 2560.503–1(h)(3)(iii). The regulations make clear, however, that 29 C.F.R. § 2560.503–1(h)(3) pertains only to "group health plans." "The term 'group health plan' means an employee welfare benefit plan to the extent that the plan provides medical care . . . to employees or their dependents . . . directly or through insurance, reimbursement, or otherwise." 29 U.S.C. § 1191b(a)(1).

Simply put, the Plan is not a group health plan. *Kallaus v. Nationwide Death Benefit Plan*, No. 2:09-CV-0899, 2012 WL 5411082, at *14 (S.D. Ohio Nov. 6, 2012) (evaluating the same Plan as in the instant case and rejecting the argument that *Loan* requires the BAC to consult a medical expert because "29 C.F.R. 2560.503–1(h)(3)(iii) only applies to group health plans and disability benefit plans, not to the claim at issue here").

Further, "[t]he need for an independent medical examination is a case-specific matter and that issue is subsumed by the question whether the decisionmaker was reasonable." *Jackson v. Metro. Life*, 24 F. App'x 290, 293 (6th Cir. 2001). *See also Boone v. Liberty Life Assurance Co. of Boston*, 161 F. App'x 469, 474 (6th Cir. 2005) ("[T]his circuit has never held that a plan administrator must hire a physician to undertake an independent review of an application's records before denying benefits."); *Cornish v. U.S. Life Ins. Co.*, No. 3:06-CV344-DW, 2009 WL 5947136, at *4–6 (W.D. Ky. Dec. 29, 2009) (where "[n]o physician or other medical authority" offered a different opinion on cause of death, and "[t]he administrative record contains no disputed evidence on this point," there was no duty to retain an independent expert, and the decision to withhold benefits based on an autopsy report, toxicology report, death certificate, and police report, which all pointed to ethanol intoxication as the cause of death, was reasonable).

The case law thus places no obligation on the BAC to consult with an independent health care professional. As in *Cornish*, the administrative record in the instant case contains no disputed evidence on the cause of Mr. Cultrona's death. The BAC acted reasonably in acknowledging what was clearly indicated by voluminous, undisputed evidence.

Mrs. Cultrona also alleges that the BAC's failure to consult an independent medical expert violated its own charter. (Pl.'s Mot. at 593.) The BAC charter requires a medical expert, "[f]or appeals that involve a medical issue," to "be present at the meeting for discussion of the appeal," and explicitly prescribes that "[s]uch expert may be member of the BAC . . . ."

(Pl.'s Mot. Ex. A at 612.)[8] Defendants argue that the BAC did not violate its charter because Mrs. Cultrona's appeal did not involve a "medical issue." (Def.s' Opp'n at 671.) The charter does not define what constitutes a "medical issue," stating simply that the concept includes, but is not limited to, "appeals for long-term disability benefits." (Pl.'s Mot. Ex. A at 566.)

Ultimately, Mrs. Cultrona has not set forth any authority related to a plan administrator's compliance with and construction of terms within its own charter. Even if Mrs. Cultrona had established that the BAC's violation of its own charter constituted arbitrary and capricious behavior, however, she has not shown that the BAC exceeded the charter's bounds in this case. Her appeal did not raise any issues related to the autopsy report, toxicology report, death certificate, or the police report. The stated basis of her appeal was simply that "she did not receive proper notice of Amendment No. 1" and that "Amendment No. 1 is otherwise ineffective to serve as a basis for denying coverage." (Admin. Rec. at 287.) Without any evidence in the administrative record to suggest that Mrs. Cultrona was attacking the findings in the aforementioned documents, the Court cannot say that the BAC acted unreasonably in determining that her appeal did not involve a "medical issue," and thus was not an appeal that required the presence of a medical expert during its discussion.[9]

---

[8] Although the BAC charter is not part of the administrative record, Mrs. Cultrona attached it to her motion in an attempt to show bias on behalf of the BAC. Because this is a procedural challenge to the BAC's denial, evidence outside the administrative record can be considered. *Wilkins*, 150 F.3d at 619. Although Mrs. Cultrona has not authenticated the document purported to be the BAC charter, defendants do not object to its consideration, even referring to the charter in making arguments of their own. (Defs.' Opp'n at 663.)

[9] Indeed, the medical examiner is a disinterested medical expert and, therefore, the BAC effectively relied on the findings of an independent medical professional who was charged by law to "decide on a diagnosis giving a reasonable and true cause of death . . . ." Ohio Rev. Code § 313.15. It was eminently reasonable for the BAC to rely upon the opinion and findings of this disinterested, objective, third party medical professional.

**6. Defendants Did Not Arbitrarily and Capriciously "Switch Their Rationale" for Denying Mrs. Cultrona's Claim**

Finally, Mrs. Cultrona contends that defendants acted arbitrarily and capriciously by "switching their rationale" for denying the benefit. (Pl.'s Mot. at 595.) A plan administrator "may not initially deny benefits for one reason, and then turn around and deny benefits for an entirely different reason, after an administrative appeal, without affording the claimant an opportunity to respond to the second, determinative reason for the denial of benefits." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010). According to Mrs. Cultrona, the defendants violated this rule when they originally denied benefits based upon a prior version of Exclusion 12—requiring operation of a motor vehicle while under the influence—and then, after appeal, based their denial upon the amended version of Exclusion 12—no longer requiring the operation of a motor vehicle. (*Id.* at 595–96.)

Defendants argue that the mistaken use of an outdated Exclusion 12 in their first denial letter was corrected and that Mrs. Cultrona was afforded the opportunity to respond to defendants' denial based upon the amended Exclusion 12. (Defs.' Opp'n at 673.) The administrative record supports defendants' position. StarLine's first denial letter is dated October 21, 2011. (Admin. Rec. at 297.) Mrs. Cultrona's counsel faxed correspondence to StarLine on November 10, 2011, disputing that the outdated Exclusion 12 applied to Mr. Cultrona's injury. (*Id.* at 295.) StarLine responded on November 17, 2011, quoting the amended version of Exclusion 12, apologizing for the mistake, reiterating its denial, and referencing Mrs. Cultrona's appeal rights in the October 21 denial letter. (*Id.* at 290.) Mrs. Cultrona's counsel responded November 18, 2011, informing StarLine to "consider this [fax to be] notice of appeal of your November 17, 2011 letter continuing to deny coverage and disclaiming liability for payment

24

under the Policy." (*Id.* at 287.) After receiving the claim file from StarLine, the BAC conducted a review of Mrs. Cultrona's appeal and sent its denial letter on January 19, 2012. (*Id.* at 236.)

Because the administrative record shows that Mrs. Cultrona appealed after being informed by StarLine of the amended Exclusion 12 and its intention to uphold its denial, StarLine afforded Mrs. Cultrona the opportunity to respond to the proper rationale used to deny her claim. Moreover, the Court is not convinced that the BAC's denial letter denies benefits for "an entirely different reason" than the one given by StarLine. StarLine's letter of November 17, 2011 is effectively a correction of its first denial letter of October 21, 2011. Accordingly, the BAC's denial letter is based on the exact same reasoning as that of StarLine.

For the foregoing reasons, the Court finds that defendants acted reasonably in denying Mrs. Cultrona's claim for benefits. Consequently, Mrs. Cultrona's motion for judgment on the administrative record on Counts III and IV of her amended complaint is denied, and defendants' motion for the same is granted.

## C. Statutory Penalties under 29 U.S.C. § 1132(c)(1)

In addition to the full amount of the Plan benefit, Mrs. Cultrona seeks statutory penalties under 29 U.S.C. § 1132(c)(1) for the BAC's alleged failure to disclose Plan documents upon her request. "[T]he purpose of § 1132(c)(1) is to punish plan administrators who fail to comply with requests for documents which ERISA requires them to provide." *Osborn v. Knights of Columbus*, 401 F. Supp. 2d 822, 825–26 (N.D. Ohio 2005). *See also Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068 (6th Cir. 1994).

Section 1132(c)(1) provides for a remedy in the event that a plan administrator violates, among other provisions, ERISA § 104(b)(4), which is codified at 29 U.S.C. § 1024(b)(4). Section 1024(b)(4) provides, in pertinent part:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

ERISA gives district courts "discretion" to impose up to $110 a day in penalties against "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . by mailing the material requested . . . within 30 days after such request . . . ." 29 U.S.C. § 1132(c)(1)(B) (establishing a maximum penalty of $100/day); 29 C.F.R. § 2575.502c-1 (increasing the maximum penalty to $110/day).

### 1. The BAC Did Not Have a Duty to Provide Mrs. Cultrona with All Documents "Relevant" to Her Claim.

As part of her claim for statutory damages, Mrs. Cultrona asserts that 29 U.S.C. § 1029(c)[10] and 29 C.F.R. § 2560.503–1(h)(2)(iii)[11] and (m)(8),[12] taken together, establish a duty

---

[10] 29 U.S.C. § 1029(c) reads:

> Format and content of summary plan description, annual report, etc., required to be furnished to plan participants and beneficiaries
>
> The Secretary may prescribe the format and content of the summary plan description, the summary of the annual report described in section 1024(b)(3) of this title and any other report, statements or documents (other than the bargaining agreement, trust agreement, contract, or other instrument under which the plan is established or operated), which are required to be furnished or made available to plan participants and beneficiaries receiving benefits under the plan.

[11] C.F.R. § 2560.503–1(h)(2)(iii) provides:

> Full and fair review. Except as provided in paragraphs (h)(3) and (h)(4) of this section, the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures—

under § 1132(c) for the BAC to provide "all of the documents relevant to [her] claim." (Pl.'s Mot. at 599.) The BAC asserts that it cannot be penalized under § 1132(c) for a violation of § 2560.503−1, and the BAC is correct.

Section 2560.503−1 is a regulation implementing 29 U.S.C. § 1133. *VanderKlok v. Provident Life and Accident Ins. Co.*, 956 F.2d 610, 615 (6th Cir. 1992). In contrast, § 1133 imposes obligations on the plan, but "does not impose liability on the plan administrator." *Id.* at 618. Accordingly, "a violation of section 1133 by the plan administrator does not impose liability on the plan administrator pursuant to section 1132(c) . . . ." *Id. See also Brucks v. Coca-Cola Co.*, 391 F. Supp. 2d 1193, 1210 (N.D. Ga. 2005) (distinguishing between "Plan documents required to be provided under Section 1024" and "the much broader category of documents 'relevant' to [claimant's] claim").

---

. . .
(iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section[.]

[12] Paragraph (m)(8) of the regulation states:

(8) A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information
(i) Was relied upon in making the benefit determination;
(ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;
(iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination; or
(iv) In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

27

**2. The BAC Breached Its Statutory Duty to Provide Mrs. Cultrona with the Plan Documents Upon Her Written Request**

Although the BAC did not have a duty to provide Mrs. Cultrona with all documents relevant to her claim, it did have a duty to provide her with the Plan documents upon written request. Mrs. Cultrona contends that the BAC breached that duty.

In a letter to StarLine sent November 18, 2011, Mrs. Cultrona's counsel, in addition to providing notice of Mrs. Cultrona's appeal, requested "all documents that you contend prove that Nationwide provided notice of [the amendment to Exclusion 12] to Mrs. Cultrona and all documents comprising the administrative record and/or supporting Nationwide's decision." (Admin. Rec. at 287.) StarLine responded on November 22, 2011, confirming receipt of the letter and stating that "[a] copy of your letter has been sent to Nationwide . . . ." (*Id.* at 283.) The BAC does not dispute that it "eventually received a copy of Plaintiff's November 18, 2011 letter . . . ." (Defs.' Opp'n at 674), and the administrative record shows that the BAC received the letter on December 2, 2011 (Admin. Rec. at 236, 242). The BAC ruled on Mrs. Cultrona's appeal (Admin. Rec. at 236–38), but Mrs. Cultrona did not receive the requested documents until June 12, 2012 (Am. Compl. ¶ 53). Mrs. Cultrona seeks statutory damages from the BAC under 29 U.S.C. § 1132(c)(1) for its delay in sending her the documents.[13]

Mrs. Cultrona agrees with defendants that the documents sought in her November 18, 2011 letter are not "expressly listed in [§ 1024(b)(4)]" (Pl.'s Mot. at 599) and argues that the phrase "other instruments under which the plan is established or operated" in § 1024(b)(4) is a broad "catch-all" provision that includes her request (Pl.'s Reply at 689). The BAC argues that

---

[13] Plaintiff originally brought this claim against Nationwide, StarLine, and the BAC (First Am. Compl. § 43), but plaintiff has since conceded that only the BAC can be liable under § 1132(c) (Pl.'s Opp'n at 645).

the documents requested by Mrs. Cultrona are not "other instruments under which the plan is established or operated" under § 1024(b)(4).

   The Sixth Circuit has interpreted the "other instruments under which the plan is established or operated" language of § 1024(b)(4) not as a broad "catch-all," but as a phrase that must be "limited to those class of documents which provide a plan participant with information concerning how the plan is *operated*." *Allinder v. Inter-City Prods. Corp.*, 152 F.3d 544, 549 (6th Cir. 1998). *See also Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 758 (7th Cir. 1999) (agreeing with other circuit courts that the "other instruments" provision should be limited to "formal legal documents governing a plan" and explaining that "[i]f it had meant to require production of all documents relevant to a plan, Congress could have said so"); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996) (holding that the "other instruments" provision "encompasses formal or legal documents under which a plan is set up or managed").

   The documents Mrs. Cultrona requested related to Nationwide's providing (or not providing) notice of the amendment of Exclusion 12 do not concern the operation of the Plan. *See Collins v. Commonwealth Indus.*, No. 07-57-C, 2009 WL 197367, at *2 (W.D. Ky. 2009) (a notice of an amendment "caus[ing] a significant reduction in the rate of future benefit accrual" under 29 U.S.C. § 1054(h)(1) "is not the type of document required to be provided under § 104").

   Similarly, the administrative record is not part of the disclosure requirements of § 1024(b)(4). *See Weddell v. Ret. Comm. of Whirlpool Prod. Emps. Ret. Plan*, No. 3:07-CV-6, 2007 WL 4521509, at *14 (N.D. Ohio Dec. 17, 2007). As a result, the BAC did not violate § 1024(b)(4) by failing to provide these documents in response to Mrs. Cultrona's request.

29

However, despite the fact that Mrs. Cultrona's document request is worded in broad terms, both the request and Mrs. Cultrona's representation of that request in her briefing show that she sought, among other things, a copy of the AD&D Policy itself. The Policy, which contained the disputed Exclusion 12, was certainly one of the "documents . . . supporting Nationwide's decision" to deny benefits. StarLine says as much in its denial letter. (Admin. Rec. at 297) ("Based on a review of the subject insurance [P]olicy . . . ."). Similarly, Mrs. Cultrona notes that her document request was motivated in part by "being provided with the wrong Plan documents on two occasions," and that defendants "failed to provide the correct [P]lan documents containing the new Exclusion 12 . . . ." (Pl.'s Mot. at 601.)[14]

At the time of Mrs. Cultrona's request, the Policy was clearly among the "currently operative, governing [P]lan documents," all of which are "instruments under which the plan is established or operated" for the purposes of § 1024(b)(4). *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 84 (1995). *See also Glasgow v. Methodist Healthcare-Memphis Hosps. Plan 503*, No. 02-2234MV, 2005 WL 3844060, at *4 (W.D. Tenn. Dec. 2, 2005) (disclosure of disability benefit policy required under § 1024(b)(4)). The BAC, thus, had a duty under § 1024(b)(4) to provide Mrs. Cultrona with a copy of the Policy.

### 3. Mrs. Cultrona Has Not Shown That She Was Prejudiced by Defendants' Breach

A showing of prejudice to the claimant is a "logical concern" in a court's decision to impose a penalty under § 1132(c)(1)(B), *Gatlin v. Nat. Healthcare Corp.*, 16 F. App'x 283, 289 (6th Cir. 2001) (citing *Bartling*, 29 F.3d at 1068–69), but it is not essential. Some courts

---

[14] Presumably referring to Mrs. Cultrona's admission that she did not seek documents "expressly listed in [§ 1024(b)(4)]," the BAC argues that "it is undisputed that [plaintiff] made no request for plan documents in connection with her counsel's November 18, 2011 letter . . . ." (Defs.' Opp'n at 676.) As shown above, this is not the case.

have imposed a penalty in the absence of a showing of prejudice. *See McGrath v. Lockheed Martin Corp.*, 48 F. App'x 543, 557 (6th Cir. 2002) (affirming $50/day); *Daniel v. Eaton Corp.*, 839 F.2d 263, 268 (6th Cir. 1988) (affirming $25/day); *Weddell*, 2007 WL 4521509, at *14 (imposing $60/day). Other courts have elected not to impose a penalty where the beneficiary cannot demonstrate prejudice. *See, e.g.*, *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 432 (6th Cir. 2007); *Moore*, 458 F.3d at 437; *Cole v. GM Ret. Program*, No. 05-73018, 2007 WL 470409, at *5 (E.D. Mich. Feb. 8, 2007).

None of the parties briefed the issue of prejudice, nor did they discuss the amount of the penalty that should be assessed if the BAC is found to have violated § 1024(b)(4). Mrs. Cultrona does mention that the BAC's failure to provide the Plan documents "impaired Mrs. Cultrona's ability to understand her rights under the Plan and to evaluate the arguments to be raised during the appeals process." (Pl.'s Mot. at 601.)

Moreover, nothing in the administrative record as a whole suggests that Mrs. Cultrona was prejudiced by the BAC's failure to provide her with the Plan documents. Mrs. Cultrona claims to have been "provided with the wrong Plan documents on two occasions" (Pl.'s Mot. at 601), but the administrative record does not contain any written requests for documents, as required by § 1024(b)(4), except her letter to StarLine giving notice of appeal, which the BAC received on December 2, 2011. Further, Mrs. Cultrona did receive Plan Amendment I, which amended, among other things, Exclusion 12, from StarLine on November 17, 2011. (Admin. Rec. at 290–91). Mrs. Cultrona, thus, had a complete set of correct Plan documents prior to giving her notice of appeal.

**4. The BAC Is Assessed a Statutory Penalty of $55/Day for Breach of Its Duty to Mrs. Cultrona**

Although Mrs. Cultrona has not shown that she was prejudiced by defendants' breach of their duty to disclose, this Court will nonetheless assess a penalty upon the BAC in light of the purpose of § 1132(c)(1), namely, "to punish plan administrators who fail to comply with requests for documents which ERISA requires them to provide." *Knights of Columbus*, 401 F. Supp. 2d. at 825–26. *See also Bartling*, 29 F.3d at 1068. The BAC, having received the complete claim file from StarLine on December 2, 2011, knew that there had been confusion over the Plan documents, but did nothing in response to Mrs. Cultrona's request for a full set of the correct ones.[15] With that in mind, the Court assesses a penalty of $55/day, one-half of the maximum statutory penalty of $110/day. The penalty is assessed beginning January 2, 2012, the thirty-first day after December 2, 2011, the day the BAC received Mrs. Cultrona's document request, and running up to and including June 12, 2012, the day the BAC produced the documents requested. This period encompasses 162 days, which, when multiplied by the penalty of $55/day, gives a total penalty assessment of $8,910 against the BAC.

Because the BAC breached its duty to Mrs. Cultrona to disclose the Plan documents upon written request, Mrs. Cultrona's motion for judgment on the administrative record is granted in part and denied in part as to Count I of her amended complaint. The BAC's corresponding motion is thus granted in part and denied in part.

---

[15] In fact, an email exchange in the administrative record, provided to the BAC on December 2, 2011, suggests that a StarLine employee originally intended to provide the full Policy to Mrs. Cultrona along with Amendment I in StarLine's November 17, 2011 letter, but was dissuaded from doing so by a Nationwide employee. (*Id.* at 288–89.)

**D. Breach of Fiduciary Duties**

Mrs. Cultrona also brings claim for breach of fiduciary duty against all defendants pursuant to 29 U.S.C. § 1132(a)(3). In that claim, Mrs. Cultrona alleges that all three defendants breached their fiduciary duties by failing to evaluate and apply the "law of the locale" in denying her claim. She also contends that StarLine made a material misrepresentation regarding Mrs. Cultrona's claim by citing a prior version of Exclusion 12, and that Nationwide Life made material misrepresentations by providing incorrect Plan documents.

As a preliminary matter, defendants contend that Mrs. Cultrona cannot bring her breach of fiduciary duty claim under § 1132(a)(3) because it is duplicative of her claim for benefits under § 1132(a)(1)(B). Indeed, a denial of benefits claim cannot be "repackaged" as a breach of fiduciary duty claim and brought under § 1132(a)(3). *Wilkins*, 150 F.3d at 616. However, the fact that an award of benefits under § 1132(a)(1)(B) would resolve a § 1132(a)(3) claim does not necessarily mean that the § 1132(a)(3) claim is a "repackaged" denial of benefits claim. *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 841 (6th Cir. 2007). A plaintiff may bring both a § 1132(a)(1)(B) claim for denial of benefits and a § 1132(a)(3) claim for breach of fiduciary duty where "the plaintiff s[eeks] recovery of benefits according to the plan terms as they were misrepresented to him by the defendant, rather than according to the actual terms of the plan." *Moss v. Unum Life Ins. Co.*, No. 11-6017, 2012 WL 3553497 at *5 (6th Cir. Aug. 17, 2012) (citing *Gore*, 477 F.3d at 841–42).

Mrs. Cultrona's allegations that defendants breached their fiduciary duties by misapplying the "law of the locale" are an exact duplicate of her denial of benefit allegations and

cannot be brought under § 1132(a)(3).[16] However, under *Moss* and *Gore*, Mrs. Cultrona's "material misrepresentation" claims may be brought under § 1132(a)(3), because she seeks recovery of the benefit according to the Plan terms as they were allegedly misrepresented to her by StarLine and Nationwide Life.

"To establish a claim for breach of fiduciary duty based on alleged misrepresentations concerning coverage under an employee benefit plan, a plaintiff must show: (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these [representations] constituted material misrepresentations; and (3) that the plaintiff relied on those misrepresentations to [her] detriment." *Moore*, 458 F.3d at 433. A fiduciary breaches his duty by providing plan participants with materially misleading information, "regardless of whether the fiduciary's statements or omissions were made negligently or intentionally." *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) (citing *Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1163–64 (6th Cir. 1988)). "Misleading communications to plan participants 'regarding plan administration (for example, eligibility under a plan, the extent of benefits under a plan) will support a claim for a breach of fiduciary duty.'" *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992) (quoting *Berlin,* 858 F.2d at 1163). "[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing disability benefits to which she may be entitled." *Krohn*, 173 F.3d at 547.

---

[16] This is true notwithstanding the fact that the Court's resolution of those allegations with respect to Mrs. Cultrona's improper denial of benefits allegations would also resolve them here. Because these are the totality of Mrs. Cultrona's breach of fiduciary duty allegations against the BAC, that claim with respect to the BAC is meritless.

**1. StarLine and Nationwide Life Were Not Acting As Fiduciaries When They Made the Alleged Misrepresentations**

ERISA defines a fiduciary as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

29 U.S.C. § 1002(21)(A). "[F]or purposes of ERISA, a 'fiduciary' not only includes persons specifically named as fiduciaries by the benefit plan, but also anyone else who exercises discretionary control or authority over a plan's management, administration, or assets." *Moore*, 458 F.3d at 438. An interpretive bulletin from the Department of Labor further explains that a person without the power to make plan policies or interpretations but who performs purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits is not a fiduciary under ERISA. 29 C.F.R. § 2509.75-8 D-2.

Mrs. Cultrona argues that StarLine and Nationwide Life were acting as fiduciaries because each was appointed by the BAC "to deliver [P]lan documents, manage the Plan, and aide [*sic*] in the disposition of Plan assets." (Pl.'s Mot. at 602.) Regardless of the fact that this is not made clear in the portions of the record Mrs. Cultrona cites for this proposition, the proper inquiry is not whether StarLine and Nationwide were fiduciaries in general, but whether they were "acting as a fiduciary (that is, [were] performing a fiduciary function) *when taking the action subject to complaint*." *Pegram v. Herdich*, 530 U.S. 211, 226 (2000) (emphasis added). Here, the actions subject to complaint are StarLine's provision of an incorrect version of

35

Exclusion 12 in the course of denying Mrs. Cultrona's claim and Nationwide's alleged provision of incorrect Plan documents in response to Mrs. Cultrona's requests.

Beginning with StarLine, Sixth Circuit case law is informative on this issue. In the leading case, *Baxter v. C.A. Muer Corp.*, 941 F.2d 451 (6th Cir. 1991), a man sought medical benefits after being injured in an automobile accident while intoxicated. 941 F.2d at 452. Citing an analogous Eleventh Circuit case, the court found that the entity in question processed claims and disbursed benefits, but that "the employer reserved the right to review the denial of claims." *Id.* at 455 (citing *Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288, 290 (11th Cir. 1989)). Because the entity was "merely a claims processor that pays claims in accordance with the plan[,]" without the power to make plan policies or interpretations, it was not acting as a fiduciary in denying benefits. *Id.* at 455–56. *See also Briscoe v. Fine*, 444 F.3d 478, 489 (6th Cir. 2006) (third-party administrator was not a fiduciary where it had power to determine eligibility for benefits, process claims, and assist plan administrator in producing reports required by law, but where employer retained final authority to determine a claim should be paid and was the entity to which dissatisfied employees were instructed to direct their appeal).

Similarly, StarLine performed only ministerial functions in its initial denial of Mrs. Cultrona's claim. StarLine processed the claim and denied payment of the benefit under the terms of the Plan, but review of Mrs. Cultrona's appeal was conducted not by StarLine, but by the BAC. (Admin. Rec. at 236–38.) Mrs. Cultrona has not pointed to anything in the record to suggest that StarLine exercised "discretionary control or authority over [the Plan]'s management, administration, or assets." *See Moore*, 458 F.3d at 438. Accordingly, StarLine did not act in a

fiduciary capacity in its denial of Mrs. Cultrona's claim and, therefore, cannot be liable for breach of fiduciary duty.

With respect to Nationwide, defendants correctly point to two problems with Mrs. Cultrona's allegations at the outset. First, as mentioned earlier, Mrs. Cultrona uses the term "Nationwide" to refer collectively to defendant Nationwide Life and its parent corporation, non-party Nationwide Mutual Insurance Company (Am. Compl. ¶ 3), a reference defendants objected to in their answers (Answers ¶ 3). Because Mrs. Cultrona alleges that she requested and received incorrect Plan documents from "Nationwide," she has not established that those requests were received and processed by defendant Nationwide Life. Second, Nationwide Life has not admitted the allegations, and no evidence appears in the administrative record to substantiate them. For these reasons alone, judgment on the administrative record for Nationwide Life is proper. Additionally, even if Mrs. Cultrona had properly stated her allegations against Nationwide Life and Nationwide Life had admitted to those allegations, Nationwide Life would nonetheless be entitled to judgment on the administrative record because its response to Mrs. Cultrona's request for Plan documents was a ministerial function, and thus Nationwide Life would not have been acting in a fiduciary capacity.

## 2. Mrs. Cultrona Did Not Rely to Her Detriment on the Misrepresentations of StarLine and Nationwide Life

Even if StarLine and Nationwide Life were acting in fiduciary capacities, Mrs. Cultrona has not established that she relied on their alleged misrepresentations to her detriment. In response to receiving materials documenting an outdated version of Exclusion 12, that which explicitly limited the exclusion to the context of operating a motor vehicle, Mrs. Cultrona claims that she did "not hav[e] additional examination or testing performed on Mr. Cultrona's body or

37

regarding whether he passed out or fell in the bathroom[.]" (Pl.'s Mot. at 603.) But Mrs. Cultrona was quoted an incorrect Exclusion 12 from StarLine over four months after Mr. Cultrona died. Further, StarLine corrected its error within a month, and Mrs. Cultrona offers no explanation of why testing or other investigation could have been performed after four months, but not after five. In addition, assuming *arguendo* that her allegations against Nationwide Life are true, Mrs. Cultrona would have first received incorrect Plan documents from Nationwide Life eighteen days after Mr. Cultrona's death, and again over four months later. Mrs. Cultrona did not order additional testing or other investigation in the seventeen days following Mr. Cultrona's death, even though the autopsy was performed the day after he died. The injury having occurred in her home, she had access to the scene, and she could have interviewed witnesses, but there is nothing to indicate that she conducted her own investigation. Moreover, Mrs. Cultrona provides no theory, nor points to any evidence in the record, to suggest that additional testing or investigation into Mr. Cultrona's cause of death would have had any effect on her claim.

Because StarLine and Nationwide Life were not acting in a fiduciary capacity when they made misrepresentations to Mrs. Cultrona, and because Mrs. Cultrona did not rely on those misrepresentations to her detriment, Mrs. Cultrona's motion for judgment on the administrative record is denied with respect to Count II of her amended complaint. Consequently, defendants' corresponding motion is granted.

### E. Attorney's Fees

Lastly, Mrs. Cultrona seeks attorney's fees. In an ERISA action brought by a participant or beneficiary, "the court in its discretion may allow a reasonable attorney's fee and

costs of action to either party." 29 U.S.C. § 1132(g)(1). When exercising this discretion, the Court considers the following five factors:

> (1) the degree of the opposing party's culpability or bad faith;
>
> (2) the opposing party's ability to satisfy an award of attorney's fees;
>
> (3) the deterrent effect of an award on other persons under similar circumstances;
>
> (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and
>
> (5) the relative merits of the parties' positions.

*Sec'y of Dep't of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985). The *King* factors "represent a flexible approach; none of them is necessarily dispositive." *Foltice v. Guardsman Prods., Inc.*, 98 F.3d 933, 937 (6th Cir. 1996) (internal quotation omitted). A fee claimant need not be a "prevailing party" to be eligible for an award of attorney's fees under § 1132(g)(1), but must achieve "some success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2159 (2010).

Other than one reference to an "approximate" total, Mrs. Cultrona has submitted no information regarding the amount or the calculation of her attorney's fees. Moreover, Mrs. Cultrona's motion for fees is premature, and is therefore denied without prejudice to renewal. *See* Fed. R. Civ. P. 54(d)(2).

## IV. CONCLUSION

For the foregoing reasons, plaintiff Nicole Cultrona's motion for judgment on the administrative record is **GRANTED IN PART AND DENIED IN PART** with respect to Count I of her amended complaint, and the BAC is assessed a statutory penalty of $8,910. Mrs.

Cultrona's motion is **DENIED** with respect to Counts II, III, and IV, and her motion for attorney's fees is **DENIED WITHOUT PREJUDICE** as premature. Additionally, defendants' motion for judgment on the administrative record is **GRANTED IN PART AND DENIED IN PART** with respect to Count I of Mrs. Cultrona's complaint and **GRANTED** with respect to Counts II, III, and IV. This case is closed. Each party to bear its own costs.[17]

        **IT IS SO ORDERED**.

Dated: March 26, 2013

                                        **HONORABLE SARA LIOI**
                                        **UNITED STATES DISTRICT JUDGE**

---

[17] This should not be construed as a remark upon the merits of Mrs. Cultrona's premature motion for attorney's fees, nor upon any future motion for fees and/or costs that any party may choose to bring. Should such a motion be brought before the Court, the Court will evaluate it anew.